**BOWER LAW GROUP PC**
David E. Bower (SBN 119546)
600 Corporate Pointe, Suite 1170
Culver City, California 90230
Tel. 213.446.6652
Fax 213.202.7880

**ADEMI LLP**
Shpetim Ademi
John D. Blythin
Jesse Fruchter
3620 East Layton Avenue
Cudahy, WI 53110
(414) 482-8000
(414) 482-8001 (fax)
jblythin@ademilaw.com

*Attorneys for Plaintiff Kevin Smith*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| **KEVIN SMITH,** Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>**INCOMM FINANCIAL SERVICES, INC., D/B/A INCOMM PAYMENTS ("INCOMM") AND PATHWARD, N.A.,**<br><br>        Defendants. | **AMENDED CLASS ACTION COMPLAINT**<br><br>**Case No. 5:23-cv-04687-BLF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff KEVIN SMITH ("Plaintiff"), individually and on behalf of all others similarly situated, brings this lawsuit against   InComm Financial Services, Inc., d/b/a InComm Payments ("InComm") and Pathward, N.A. ("Pathward") (jointly, "Defendants") (collectively, the "Parties"), and allege as follows:

# I.    I. INTRODUCTION

1.      InComm sells prepaid debit cards, including general purpose, non-reloadable Visa and Mastercard Prepaid Cards such as its "SecureSpend" ("Non-Reloadable Cards" or "SecureSpend" Cards") and general purpose, reloadable cards such as "Vanilla" Visa and Mastercard Prepaid Cards (hereinafter "Reloadable Cards"). InComm also sells, or used to sell, store-branded cards such as "Target" gift cards (collectively, "Gift Cards"). This action addresses SecureSpend Cards and does not include Reloadable Cards or Non-Reloadable "Vanilla" Cards.

2.      Consumers can load cash on the reloadable varieties of Reloadable Cards at retail locations and even have their paychecks, government benefits, and tax refunds deposited directly onto Reloadable Cards.

3.      Non-Reloadable Cards have funds within a specified range between $20 to $500, as chosen by the consumer and loaded on the card (the "Card Value"), available to be used by whomever purchased or received the Cards.

4.      Gift Cards operate on the Visa or MasterCard network, and consumers can use them as they would a Visa or MasterCard debit card to make purchases and pay bills, among other things. SecureSpend cards and other Non-Reloadable Cards may not be used to withdraw cash from ATMs. https://www.securespend.com/help.

5.      InComm markets Gift Cards to consumers nationwide in many retail stores, including supermarkets, convenience stores, and other retailers. InComm also partners with large businesses that have nationwide distribution, such as Walmart, Target, Walgreens, and 7-Eleven, to market and sell Gift Cards. *See* https://www.securespend.com/whereToBuy.

6.      InComm has a history of denying consumers access to funds loaded onto their Gift Cards. People who receive these Cards ("Recipients") from Purchasers as gifts report that their Cards

AMENDED CLASS ACTION COMPLAINT

have no value or less than Card Value. Purchasers who use the Cards for their own purposes also report that their Cards have no value or less than the Card Value.

7.     The Card Value of Plaintiff's Cards was either partially or completely depleted, or never loaded onto the Cards, before Plaintiff tried to use the Cards.

8.     Plaintiff purchased three Non-Reloadable Gift Cards, none of which function correctly.

9.     Plaintiff asked InComm to reimburse Plaintiff the full-Card Value of his depleted and/or non-functioning Gift Cards. InComm did not do so. Instead, InComm routed Plaintiff's customer service phone calls requesting reimbursement of amounts to a call center in the Philippines, placed his calls on hold for hours, and then told Plaintiff that InComm would mail Plaintiff replacement cards, which never arrived.

10.     InComm is aware of the consumer complaints because InComm has responded to many of the complaints on the Better Business Bureau's ("BBB") website as well as by mail, email, and or telephonic communications. As of March 7, 2024, BBB's website indicates consumers have submitted 1,773 total complaints about InComm cards in the last 3 years.

11.     InComm has been engaged in similar litigation in the Central District of California over InComm's "Vanilla" brand Gift Cards. This action does not address "Vanilla"-brand Reloadable or Non-Reloadable Gift Cards.

12.     Despite being aware of consumer complaints regarding its Gift Cards, InComm continues to engage in unfair, unlawful, and fraudulent practices by marketing Gift Cards with specific Card Value amounts, even though that is not the case.

13.     Plaintiff alleges the following upon personal knowledge as to Plaintiff and Plaintiff's own experiences and, as to all other matters, upon information and belief including due investigation

AMENDED CLASS ACTION COMPLAINT

1    conducted by his attorneys.

2    **II. PARTIES**

3        14.    Plaintiff KEVIN SMITH is, and at all times mentioned herein, was a natural person

4    residing in the County of Santa Clara, in the State of California.

5        15.    Defendant InComm is a Delaware corporation with its principal place of business in

6    Atlanta, Georgia. As of approximately the date of this complaint, InComm is licensed to do business

7
     in the State of California and regularly conducts business in Santa Clara County, including
8
9    partnerships with national businesses and banks that sell InComm debit cards in Santa Clara County.

10       16.    Defendant Pathward N.A. is a Delaware corporation headquartered in Sioux Falls,

11   South Dakota. Pathward N.A. is a subsidiary of Pathward Financial, Inc., which is a Delaware

12   corporation headquartered in Sioux Falls, South Dakota.

13       17.    Prior to 2022, Pathward N.A. was known as "Metabank, N.A." and Pathward
14
     Financial, Inc. was known as Meta Financial Group, Inc. Metabank N.A. changed its name to
15
16   Pathward on or around March 29, 2022. *See* "MetaBank Announces Name Change to Pathward."

17   https://www.businesswire.com/news/home/20220329005901/en/MetaBank-Announces-Name-

18   Change-to-Pathward.

19       18.    Pathward N.A. issues SecureSpend cards sold and serviced by Incomm, including
20
     cards sold throughout California. Pathward N.A. is the issuer of the Gift Cards that were purchased
21
22   by KEVIN SMITH and members of the Classes. Upon information and belief, funds loaded onto Gift

23   Cards are held at or transferred to Pathward N.A.

24                           **JURISDICTION AND VENUE**

25       19.    This Court has original jurisdiction over this matter pursuant to the Class Action

26   Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship

27

28

AMENDED CLASS ACTION COMPLAINT

from one defendant, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

20. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a), because all or some of the unlawful practices and violations of law alleged herein occurred and are occurring in the County of Santa Clara, California. Furthermore, Defendants regularly conduct business within the State of California, Santa Clara County, and Plaintiff resides in this judicial district.

## FACTUAL ALLEGATIONS

21. InComm sells SecureSpend Visa and MasterCard pre-loaded, physical debit cards ("SecureSpend Cards") online and in retail stores across the country that it markets as "Gift Cards."[1]

22. SecureSpend Cards have preloaded a specified amount ("Card Value") from $20 to $500, available to be used by whomever purchased or received the Cards.

23. Consumers who buy Cards ("Purchasers") pay InComm the Card Value plus a fee. Plaintiff paid a fee of $5.95 for each SecureSpend or Non-Reloadable card he purchased.

24. People who receive these Cards ("Recipients") from Purchasers as gifts report that their Cards have no value or less than the Card Value. Purchasers who use the Cards for their own purposes also report that their Cards have no value or less than the Card Value.

25. Plaintiff purchased Cards that had purchasing power less than the Card Value when he first attempted to use their Cards.

26. Upon information and belief, the Card Value of Plaintiff's SecureSpend Card was partially or completely spent by unknown third parties ("Unauthorized Users") *before* Plaintiff tried to use the Cards.

---

[1] https://securespendcardbalance.net/ (last visited Mar. 3, 2024)

AMENDED CLASS ACTION COMPLAINT

27.     Plaintiff asked InComm to reimburse to him the full, Card Value of his depleted Card. InComm did not do so.

28.     Plaintiff's experiences are not isolated incidents. Purchasers and Recipients across the country report on multiple consumer websites that their Cards contain less than Card Value and that their online SecureSpend accounts show Unauthorized User purchases against the Card Value of their Cards. They further complain that InComm failed to reimburse them and that InComm's customer service seemed intentionally designed to frustrate attempts to be reimbursed.

29.     Through these complaints, InComm has known for years that the Card Value of their SecureSpend Cards is insecure.

30.     In continuing to sell SecureSpend Cards while knowing that the Card Value of their SecureSpend Cards is insecure, InComm fraudulently omits three material facts.

31.     First, InComm omits that Cards commonly have less purchasing power than their Card Value at the time of purchase due to theft.

32.     Second, InComm omits that Unauthorized Users exploit a specific flaw in InComm's online security measures, detailed below, that allow them to access and spend the Card Value of Plaintiffs' and Class Members' SecureSpend Cards before Plaintiffs and Class Members can do so.

33.     Third, InComm omits that it avoids reimbursing Purchasers and Recipients for fraud losses when they occur prior to the consumer's first attempted use of the Card.

34.     InComm should have disclosed the facts in Paragraphs 31 through 33 above on the exterior of the packaging of Physical Cards.

35.     InComm knows that no reasonable consumer would intentionally gamble by buying a gift card that is particularly vulnerable to fraud and is, therefore, likely to contain less than its Card Value, so InComm does not disclose its security problems.

AMENDED CLASS ACTION COMPLAINT

36.     InComm could but does not implement additional security measures that would decrease or eliminate Card fraud because those measures would increase its costs and reduce its profits. So rather than protecting Purchasers and Recipients, InComm chooses to secretly shift the risk of fraud loss to innocent consumers.

37.     Plaintiff, on behalf of himself and other similarly situated individuals who also purchased or received Cards, seeks to recover economic losses from InComm for violation of applicable California consumer protection statutes and unjust enrichment.

### Plaintiff's Non-Reloadable card purchases

38.     In December 2021, Plaintiff wanted to buy various prepaid cards for the purpose of making secure payments for consumer goods and services, including paying his phone bill, purchasing domain names, paying for web hosting service, making purchases on Amazon.com and other expenses.

39.     While shopping at the Lucky Supermarket at 2175 Grant Rd, Los Altos, CA 94024, ("Lucky") in late December 2021, Plaintiff noticed SecureSpend Cards on display.

40.     The display for the Gift Cards advertised:

Non-Reloadable Gift Card

Safe for online shopping, traveling, paying bills and more!

**NO FEES** after purchase

- 7 -

1
2
3
4
5
6
7
8
9
10
11
12



13   41.   The reverse side of the packaging for the SecureSpend Card advertised:

14   Convenient to use every day for –

15   Dining, Travel, Gas, Pay Bills, Groceries

16   Online Shopping, Home Improvement, & Gifts!

17
18   • Non-Reloadable

19   • No Fees After Purchase

20   • No Registration Required

21
22
23
24
25
26
27
28

- 8 -

42.    Plaintiff did not retain the packaging of his SecureSpend Cards. The photos above are an example of the front and back of the packaging of a SecureSpend Card. The photos are consistent with the packaging of the SecureSpend Card Plaintiff purchased at Lucky, except for the card number data.

43.    Plaintiff decided to purchase a $200.00 SecureSpend Card from Lucky. For the Gift Card, Plaintiff was charged $200.00 plus a $5.95 activation fee. The first eight digits of Plaintiff's SecureSpend card are 4087 5800 and the expiration date is 9/29. Plaintiff will provide the remaining digits to the Court or Defendant's counsel upon request.

44.    Plaintiff relied upon the representations on the package that the SecureSpend card was

AMENDED CLASS ACTION COMPLAINT

"Safe for online shopping, traveling, [and] paying bills," the "No Registration Required" statement, and that the statement that the SecureSpend card was: "Convenient to use every day for … online shopping." Plaintiff specifically wanted to purchase a Gift Card that would allow him to make online payments without having to disclose his personal information, specifically, his credit card information, on the internet.

45.     If not for the above representations that the SecureSpend Card was "safe," that no registration was required to use the card, and that the card could be used for online shopping, Plaintiff would not have purchased the SecureSpend Card.

46.     At the time Plaintiff purchased the SecureSpend Card, the store cashier activated the SecureSpend Card by scanning it through the window in its package (*see* para. 39, 40, *supra*) and inputting the $200.00 Card Value. Plaintiff received a receipt for the purchase in the amount of $205.95.

47.     On or around July 2021, Plaintiff also purchased a $200.00 Non-Reloadable "Target" Card and a $100.00 Non-Reloadable "Target" Gift Card for personal use and for gifts to family members, including Plaintiff's nephew. Plaintiff paid a $5.95 activation fee for each of the Gift Cards.

48.     However, none of the Gift Cards that Plaintiff purchased were functional when Plaintiff or his nephew attempted to use them.

49.     Plaintiff stored the SecureSpend Card, inside its protective packaging, in his desk drawer, for approximately, but less than, one year. Plaintiff lives alone, and no other person had access to his desk or the physical SecureSpend Card within.

50.     In December 2022, Plaintiff removed the SecureSpend Card from its packaging and attempted to use the SecureSpend Card to make a purchase on Amazon.com. Amazon.com declined the card.

51.     After the card was declined, Plaintiff visited SecureSpend's website to check the card.

52.      Plaintiff created an online account on securespend.com and attempted to register the card on the website. The website returned an error message to the effect that the SecureSpend Card could not be registered.

53.     Concerned as to why the Gift Card was declined and could not be registered, Plaintiff called InComm customer service at (866) 387-7363 in December 2022. However, InComm customer service was never able to remedy any of the problems that had been experienced with the Gift Card.

54.     Plaintiff made several attempts to contact InComm customer service by telephone between December 2022 and around April 2023. On most telephone calls to InComm customer service, Plaintiff was placed on hold for more than an hour and hung up without reaching a live representative. Plaintiff estimates he spent between 20 and 30 hours attempting to resolve the loss of funds on his SecureSpend Card, including time spent on hold.

55.     Particularly, during one telephone call to InComm customer service, Plaintiff navigated around various call options and attempted to connect with a live customer service representative.

56.     Eventually Plaintiff was put in contact with a customer service representative in a call center in the Philippines.

57.     The representative told Plaintiff that InComm would send Plaintiff a replacement Gift Card by FedEx, but Plaintiff has never received a replacement card or even a notification that a replacement card had been shipped.

58.     Plaintiff has attempted to contact InComm customer service numerous times since his initial phone call, but on most attempts since the initial call, Plaintiff has been disconnected after he selected the option to speak to a live customer service representative. When he was able to reach a

representative, the representative told him that a replacement card would be sent by FedEx, but the representative would not provide a tracking number.

59.     Upon information and belief, InComm has records of Plaintiff's communications with InComm regarding Plaintiff's SecureSpend Card in its files.

60.     Plaintiff has never received a replacement card or refund of the balance of his SecureSpend Card.

61.     Plaintiff specifically chose SecureSpend Cards because he believed they would allow him to make online payments without having to disclose his personal information on the internet. Plaintiff wants to purchase SecureSpend Cards in the future but cannot do so in an informed manner because he cannot rely on the balance to be correct, or available at all, when he uses the card, and he cannot rely on InComm to refund or replace SecureSpend cards that are compromised through no fault of Plaintiff.

62.     Upon information and belief, as described below, unauthorized persons unlawfully accessed Plaintiff's SecureSpend card account and stole the balance on the SecureSpend Card.

**InComm fails to secure the Card Value of Cards
from widespread theft by Unauthorized Users.**

63.     Purchasers can buy Non-Reloadable Cards, including SecureSpend Cards, from retail stores.

64.     Purchasers select a Card, and at the register, the clerk activates the Card and loads the card with a value between $20 and $500, which may be used for future purchases.

65.     InComm charges Purchasers a flat fee of $5.95 for each SecureSpend Card purchased. InComm charged Plaintiff $205.95 for each of Plaintiff's purchases of a $200 Card Value Non-Reloadable gift Card ($200, plus a fee of $5.95).

66.     InComm retains the fees that it charges Purchasers. The fees are an out-of-pocket cost

to Purchasers, and those fee amounts are not available for use on the Cards after purchase.

67.     Purchasers can buy Non-Reloadable Cards at retail stores such as drug stores and supermarkets, most often from a point-of-purchase display at a store register. Packaging for Non-Reloadable Cards displays the range of Card Values that may be loaded on each Card when purchased, and that is the amount that should be available for use by the intended Recipient.

68.     As they sit on the rack, Non-Reloadable Cards are worthless.

69.     A clerk at a retail store must activate Non-Reloadable Cards at the time of purchase for the Physical Cards to hold any value. Activation makes the Card Value of Non-Reloadable Cards ready to spend. The Non-Reloadable Cards are then ready to use within 24 hours with no additional activation needed.

70.     Yet when Plaintiff and his nephew went to use their Non-Reloadable Cards for the first time, the cards were declined at the point of sale.

71.     Upon information and belief, the reason why Plaintiff's and Plaintiff's nephew's Non-Reloadable cards were declined at the point of sale all or a portion of the Card Value had already been stolen and spent by Unauthorized Users.

72.     Plaintiffs' experiences were mirrored by Purchasers and Recipients around the country, as they reported in online reviews. Examples of these complaints and reviews are shown below.

73.     As of March 7, 2024, the Better Business Bureau ("BBB") reflects 23 unanswered complaints against "SecureSpend," causing SecureSpend to be issued an "F" rating. The BBB also shows several consumer reviews of SecureSpend.  The stories in the complaints and reviews mirror Plaintiffs' experiences. For example:

AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Melanie B**

★☆☆☆☆                                             02/05/2024

This company is a fraud. I received a $100 gift card from my employer and I planned on using the card when I went on vacation and noticed the card is only valid in ****************, so I decided to activate the card and use it the grocery store instead. When I activated it the money was there but when I went to use the card 2 hours later the money was gone. I called customer service and they said it was used at SP 234 I told them I had no clue what that was and I didn't use it. They told me to call back after 2/4/24 to file a dispute which I didn't understand why I had to wait to file a dispute. Well, I called them this morning and I still have yet to receive the email dispute packet. With all the bad reviews they need to be shut down and money needs to refunded.



**Belinda W**

★☆☆☆☆                                             01/26/2024

If I could give you no stars I would I brought a card for 500 Dollars Try to use it at the store it would not work , went online to see if it was activated, this took several attempts to get online. It was activated Call customer servicethey ask me several questions to confirm the card was mine, after that they said the card was ok. I waited until the next day went to the store it was 0 balance.Whoever took my information probably took my money I called back again and the other lady stayed that the woman who asked me the question asked me to much She supposed to only ask me for the card number I wish I would have known this before I process the card I always buy gifts cards so I can buy groceries when I have an emergency Never buy this card



**Ve S**

★☆☆☆☆                                             10/27/2023

I got a securespend Mastercard in ***** and put 400$ on it. I only used 170$ and the next day my card was frauded the remaining balance. I have been waiting for a new card or any information following a dispute to no avail. I read online that this is a scam company (*****), I am surprised Mastercard has their name on it. Still waiting. No luck..

- 14 -

AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



**Initial Complaint**                   **Complaint Type:** Problems with Product/Service
02/05/2024                              **Status:** Unanswered ❓

Purchased a SecureSpend card 2/1/2024 and in less than an hour the entire $300 had been spent, before I had even gone home to try it. After struggling with their website for hours and not being able to log in, I had to get a friend to check their website and the card for me, showing an exactly $300 charge to a sports betting site. I have called over 10 times now since the 1st (it is now the 5th) - the charge still has not been cancelled or refunded. One customer support rep told me to wait until the 9th when the charge wasn't pending still, which made no sense. Every other time they spoke over me, I could not understand them well, or they hung up on me. Now they're saying that the charge has gone through and I need to receive a "legal packet" in the mail, fill it out, send it back to them WITH ID, and "wait 3-4 weeks for a POSSIBLE refund". Seeing all of the other complaints about this company and having been scammed myself, I can only assume that the company itself is in on this, or at least some employees. I have reported them to the *** and I encourage you to do the same.

 2 reviews   ◉ US



**Initial Complaint**                   **Complaint Type:** Problems with Product/Service
11/15/2023                              **Status:** Unanswered ❓

I bought a secure spend prepaid mastercard from ******* for $200. Right after purchasing it, I went to pay for my phone bill online and it said "system error". I then tried to log into the secure spend website and it also said system error. It looks like the card that was inside the package was a fraudulent card and was used by someone else, as I tried to call customer service and they said the card was used by someone named ********* and had 0 dollars on it. I never got to use the card for any purchases. Looking at the card now, I see there are some discrepancies on it compared to the package it came in. The customer service phone number is mismatched and there are spelling errors. The front of the card also looks like it could be a sticker that peels off from the side. It is clear that this is some kind of scam. I am requesting my money be sent back and this company be investigated for fraud. Wal mart should also be held responsible for selling these cards. Thank you.

20      74.     SecureSpend's low ratings and complaints are consistent across review sites. As of

21  March 7, 2024, Pissedconsumer.com rates SecureSpend 1.0 stars out of 5 based on 52 reviews. The

22  Better Business Bureau rates SecureSpend 1.57 out of 5 based on 7 reviews.

23      75.     The stories are consistent: Purchasers and Recipients try to use their Cards and find

24  that Unauthorized Users have almost instantly spent all or most of the Card Value. As explained

25  below, that almost instant use is the key to understanding how Unauthorized Users steal Card Value

26

27
28                                  - 15 -

1    and how InComm fails to prevent the theft.

2          76.    InComm is responsible for every possible explanation for how Unauthorized Users

3    obtain Card numbers and steal Cards' Card Value.

4                 ***In-store tampering with Non-Reloadable Cards is not likely the cause.***

5          77.    Early gift card fraud involved thieves tampering with the packaging of physical Gift

6    Cards in a store to open them and obtain the sixteen-digit card number, CVV, and expiration date

7    right off the back of the Gift Cards.

8          78.    Here, such in-store tampering is not likely to be the cause of the fraud.

9          79.    Upon information and belief, SecureSpend packages its Physical Cards in sealed

10   cardboard envelopes that a vendor, Travel Tags, specifically designed to be tamper-proof.

11         80.    Upon information and belief, Travel Tags also packages InComm's other brand of

12   Non-Reloadable Cards – Vanilla.

13         81.    Travel Tags explains:



**HIGH SECURITY**

## SECURE PACK

Our selection of Secure Packs for open and closed loop cards include several unique security features that create highly visible evidence of tampering prior to purchase.

- Multi-panel concepts
- Inner security slits
- Perforated tear strips
- Bar code window for scan activation
- Mag stripe on package for swipe activation
- Foil or spot foil capabilities
- Scratch-offs and security labels [2]

82.   SecureSpend card packaging is similar:

---




83.    Further, package tampering cannot explain how Unauthorized Users are able to access E-Card information for fraudulent use.

### InComm's employees could be stealing Card information.

84.    Given that tampering with physical packaging doesn't explain the widespread fraud endemic to SecureSpend Cards, there are only three plausible explanations as to how this widespread fraud is occurring. The first and simplest possible explanation for the widespread, unauthorized use of Card funds is that the Unauthorized Users are InComm insiders who use their position within InComm to obtain access to Card information to steal Card Value from Purchasers and Recipients.

85.    If this is the case, InComm is responsible for failing to safeguard its customers' Cards from its employees or contractors.

***InComm's insufficient data security could allow cybercriminals to illegally access InComm's database of Card information.***

86.     The second possible explanation is that InComm's electronic databases of SecureSpend Card information have been illegally accessed by cybercriminals, enabling Card information to be stolen for use by Unauthorized Users.

87.     Illegal markets for Card information exist on the Dark Web, an encrypted portion of the internet that is not indexed by search engines and only accessible by means of special software, allowing users to remain anonymous.

88.     Cybercriminals target gift card companies' data systems to steal Card information that they can later sell on the Dark Web. See e.g. https://geminiadvisory.io/gift-card-shop-breached/ (reporting a 2021 attack on Cardpool.com and the subsequent sale of 330,000 stolen numbers on the Dark Web) (last visited Mar. 4, 2024).

89.     If a cyberattack was the cause of Plaintiffs' losses, SecureSpend is responsible for those losses because it failed to implement adequate and industry-standard data security to prevent a widespread data breach.

90.     SecureSpend can stop such attacks with reasonable investment in adequate cybersecurity.

***Unauthorized Users may have InComm's formula for generating Card information.***

91.     The final possible explanation is that SecureSpend uses an algorithmic formula to create Card numbers, expiration dates, and CVVs, that Unauthorized Users have deciphered this formula, and that Unauthorized Users use their own algorithm to generate Card information.

92.     Many Cards have the same first 12 digits, and only the last four are randomized, making it easy for Unauthorized Users to guess or use computer programs to discern the last four digits.

93.     Unauthorized Users have been draining Card value for years. If a cracked algorithm is to blame, InComm would need only establish a new algorithm to stop the theft.

***Each possible explanation for the widespread, fraudulent use of InComm Non-Reloadable Cards requires that Unauthorized Users exploit a security flaw in InComm's systems.***

94.     Each of the three possible explanations (and tampering with Physical Card packaging) would only give Unauthorized Users unactivated Card numbers.

95.     It is only after Cards are activated at the time of purchase, in-person at a store, that the Card Value is available for use.

96.     Unauthorized Users are able to access and spend Card Value very close in time to Card activation. The only way they can do that is if they are watching SecureSpend's website to see when Cards are activated.

97.     Purchasers and Recipients can access the account balance of their cards at https://securespend.com/. The page looks like this:



98.     Unauthorized Users use this site to check the validity of the Card information that they illegally obtain through one of the three methods described above and to learn when Cards are activated.

99.     Before a Card is activated, when an Unauthorized User enters the Card information into SecureSpend's site, the balance shows as zero because the Card does not have any purchasing power until activated.

100.     To access and spend Card Value very close in time to Card activation, Unauthorized Users must continuously and remotely monitor the balances of unactivated Cards through SecureSpend's website.

101.     No human could monitor the balances of hundreds or thousands of unactivated Cards often enough to catch each Card's activation with the consistency that Unauthorized Users achieve.

102.     Unauthorized Users use a computer program to constantly monitor unactivated Cards for activation. Such programs repeatedly query https://securespend.com/#/ looking for a balance on a previously unactivated Card. As soon as a spendable balance shows up on a Card, the program notifies Unauthorized Users, who then quickly spend that Card Value.

103.     InComm could, but chooses not to, take steps to prevent Unauthorized Users' computer programs from accessing https://securespend.com/#/.

***InComm facilitates each of the three possible methods of Card fraud because it allows Unauthorized Users to continuously, remotely, and automatically monitor balances of unactivated Cards.***

104.     Regardless of which method Unauthorized Users are employing to obtain SecureSpend Card numbers, Unauthorized Users could not exploit their wrongfully obtained Card information unless they know when Cards are activated.

105.     Unauthorized Users would not be able to determine when Cards are activated without using automated computer programs.

106.     Online security tools exist that prevent access to websites by automated computer programs. Since at least 2017, cybersecurity experts have advocated using these tools to prevent

criminal access to gift card balance-checking sites.

107.    One of the most common such tools is CAPTCHA (Completely Automated Public Turing test to tell Computers and Humans Apart), which requires users to solve a visual puzzle that automated computer programs would not be able to solve before allowing access to a website. An example of a CAPTCHA appears below.



108.    There was no CAPTCHA on https://securespend.com when Plaintiff accessed it in December 2022.

109.    Implementing CAPTCHA or something similar on https://securespend.com/ would prevent Unauthorized Users from using automated computer programs to access the site to check

balances, disrupting a key part of Unauthorized Users' fraudulent scheme to steal Card Value from Purchasers and Recipients.

110.    InComm not only knows about the existence of tools like CAPTCHA, it also knows how those tools can be implemented to prevent malicious computer programs from accessing a balance inquiry site.

111.    Employing CAPTCHA or a similar tool on its website would cost InComm money. Rather than spend that money to thwart Unauthorized Users, InComm chooses to shift the risk of loss to Purchasers and Recipients.

112.    InComm could also eliminate the balance inquiry website entirely and substitute a phone system that could not be exploited by Unauthorized Users' software. Building and maintaining such a phone system would cost InComm money.

113.    InComm could also, but does not, monitor its website for balance inquiries on unactivated Cards. No legitimate Purchaser or Recipient would check the balance of an unactivated Card because they do not have Card information until after purchase when the Card has been activated. The only reason anyone would monitor unactivated Card numbers is to steal the balance as soon the Card is activated.

114.    InComm could then flag Card numbers that experience balance checking prior to activation for automatic reimbursement should there be a claim of fraud. Such monitoring would require investment into software and personnel, reducing InComm's profit.

115.    Thus, no matter what method of fraud Unauthorized Users are employing to obtain Card numbers, InComm has the same fundamental security problem: allowing Unauthorized Users to track the Card activation so that Cards can be used by Unauthorized Users at or near the time of activation.

AMENDED CLASS ACTION COMPLAINT

116.    InComm and its substandard security measures discussed above are responsible for the widespread, fraudulent depletion of Card funds regardless of which of the three possible explanations is being exploited by Unauthorized Users. In other words, because Unauthorized Users can track when Plaintiff's and Class Members' Cards are activated—as a direct result of InComm's failure to prevent such tracking—Unauthorized Users deplete the Card Value of Plaintiff's and Class Members' Cards, and Plaintiffs and Class Members are unable to use them. Plaintiffs' and Class Members' losses are, therefore, the direct and proximate result of InComm's negligent, reckless, and/or willful security lapses.

117.    Acknowledging and addressing the widespread fraudulent use of Card funds would further cut into InComm's profit because it would also have to reimburse Purchasers and Recipients for charges made by Unauthorized Users.

118.    As explained below, InComm takes affirmative steps to avoid paying fraud losses.

***InComm fraudulently fails to inform Purchasers and Recipients of the likelihood of theft, that it could remedy that theft but chooses not to, and that if theft occurs, InComm will actively try to avoid reimbursement.***

119.    InComm knows that its Cards are extremely prone to access by Unauthorized Users, and it knows that Unauthorized Users steal Card Value from Purchasers and Recipients. InComm knows this, at least in part, because it received hundreds if not thousands of complaints from its customers about depleted funds.

120.    InComm also knows that it could substantially decrease the incidence of Card Value theft if it chose to implement additional security protections.

121.    InComm is not the only gift card company whose gift cards experience fraud.

122.    However, based on investigation and belief, InComm is unique among its peers in the incidence of fraud on its Cards. Yet InComm has apparently taken no steps to follow industry

AMENDED CLASS ACTION COMPLAINT

standards in preventing that fraud and reimbursing consumers who experience fraud.

123.    InComm also fails to inform consumers about the prevalence of theft. InComm's Non-Reloadable Card packages contain no disclosure about the prevalence of theft. They contain no disclosure that Non-Reloadable Cards could be worth less than the Card Value because of theft by Unauthorized Users. They contain no disclosure that InComm could increase security measures for Cards but chooses not to implement such measures, leaving Cards particularly vulnerable to fraudulent use.

124.    InComm makes only three statements on its packaging that even vaguely refer to the possibility of fraud: (1) "IF TAMPER EVIDENT, DO NOT PURCHASE;" (2) "For security purposes, please check that the underlined portion of the number matches the number below;" and (3) "Protect yourself. Never provide prepaid card information to someone you don't know. Fraudulent transactions may result in the loss of your money with no recourse."

125.    By making only these three statements, InComm misleads consumers into believing that (1) as long as there is no evidence of tampering on the packaging, (2) as long as the underlined portion of the card number matches what is on the packaging, and (3) as long as the user does not provide the Card information to a third party, then its Cards are secure from fraud.

126.    That belief, however, is untrue, as set forth above and below. InComm omits any mention of the widespread fraud that its Cards experience from Unauthorized Users and fails to disclose that there is a substantial risk that its Cards will have less than their Card Value shortly after activation.

127.    InComm's website contains no mention of Unauthorized Users or theft of Card Value outside the context of lost or stolen cards. Even if a Purchaser sought out information about stolen gift cards in the "help" section of the SecureSpend website, those FAQs mention theft only in the

context of a physically lost or stolen card and falsely suggests that InComm will provide replacement Cards to Purchasers or Recipients for such theft—though only if the individual still has the card number, which seems unlikely in cases in which a card is stolen.

128.    Nothing on InComm's website addresses cases in which the balance is depleted before the first attempted transaction. The website states "**NO REFUNDS WILL BE PROVIDED FOR AMOUNTS DEBITED FROM THE LOST OR STOLEN CARD BEFORE YOU NOTIFY US**." It is impossible for the consumer to know when Card balances are stolen electronically until the consumer attempts to use the card. The website contains no disclosure that InComm could increase security measures for Cards but chooses not to implement such measures, leaving Cards particularly vulnerable to fraudulent use.

129.    InComm has a "Security & Fees" portion of the help section on the SecureSpend website, but none of the listed questions has anything to do with security—let alone InComm's failure to implement reasonable security measures.

130.    Perhaps most importantly, InComm fails to tell Purchasers and Recipients either on the packaging of Physical Cards or on its website where it sells E-Cards that it will not reimburse them if Unauthorized Users steal all or a portion of Cards' Card Value.

***InComm takes affirmative steps to avoid reimbursing
Purchasers and Recipients for losses.***

131.    As demonstrated by Plaintiffs' experiences and the internet reviews above, InComm takes affirmative steps to avoid reimbursing Purchasers and Recipients for losses. InComm uses long telephone hold times, nonresponsive telephone operators, onerous and lengthy claims processes, and unfulfilled promises of replacement Cards to discourage Purchasers and Recipients from obtaining reimbursement.

132.    Plaintiff spent between 20 and 30 hours trying to obtain reimbursement from InComm.

Most people would have stopped long before that. When Plaintiff was actually able to reach a live representative, the representative stated that a replacement card would be sent, but no replacement card was sent.  In short, InComm gives Purchasers and Recipients the runaround until they give up.

133.    InComm omits these facts because it knows that no reasonable consumer would buy a Card for the Card Value, plus taxes and InComm's fees if they knew there was a substantial chance that the Card will contain less purchasing power than the Card Value because InComm's products are plagued by theft. Nor would a reasonable consumer buy a Card for the Card Value, plus InComm's fee, if they knew that even after Unauthorized Users depleted the Card Value of the Card because of InComm's failure to secure that Card Value, InComm would intentionally erect barriers to reimbursement.

134.    Furthermore, when Purchasers and Recipients give up on getting a reimbursement from customer service, it is to InComm's benefit. While it was InComm's failure to implement reasonable security measures that caused Purchaser's and Recipient's losses, InComm avoids reimbursing those individuals for those losses, reaping direct monetary benefit.

135.    Adequate disclosures and listing the above-described omitted facts (¶¶ 31-33) on Physical Cards' packaging explaining the true risk that Cards may not have purchasing power equal to the Card Value, would substantially reduce InComm's sales or halt them entirely. No reasonable Purchaser would purchase Cards if they knew the facts InComm omits. If no Purchasers purchased Cards, no Recipients would receive Cards.

**California Law Limits Consumers' Liability for
Unauthorized Transactions on Non-Reloadable Cards**

136.    Civil Code section 1748.31 limits a debit cardholder's liability for unauthorized charges.

137.    The consumer liability limits established by section 1748.31 cannot be waived. Civ.

Code § 1748.32.

138.    A debit cardholder cannot be held responsible for an unauthorized charge unless all of the following conditions are met under Civil Code section 1748.31(a):

(1) the card is "an accepted debit card";

(2) the "issuer has given adequate notice to the debit cardholder of the potential liability";

(3) the issuer has provided "a description of the means by which the debit card issuer may be notified of loss or theft of the card";

(4) the "unauthorized use occurs before the debit card issuer has been notified by the debit cardholder that an unauthorized use of the debit card has occurred or may occur as a result of loss, theft, or otherwise"; and

(5) the "issuer has provided a means to identify the debit cardholder to whom the debit card was issued."

139.    Even if these conditions are satisfied, the cardholder is only responsible for up to $50 of an unauthorized transaction. Civ. Code § 1748.31(a)(2).

140.    Assuming the five conditions described above are satisfied, if (1) a cardholder "fails to report an unauthorized use that appears on a periodic statement within 60 days of the debit card issuer's transmittal of the statement," and (2) "the issuer establishes that an unauthorized use would not have occurred had the debit cardholder notified the issuer within the 60-day period," then (3) the cardholder can be held liable for transactions that occur "after the close of the 60 days and before notice to the issuer." Civ. Code § 1748.31(b).

141.    InComm, which does not provide periodic statements to cardholders, does not comply with its obligations under Civil Code section 1748.31.

## CLASS ACTION ALLEGATIONS

142.    Plaintiff and the members of the Class and Sub-Class have all suffered an injury in fact as a result of the Defendants' unlawful conduct.

143.   Plaintiff brings this complaint on behalf of himself, and all others similarly situated under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

144.   The Nationwide Class (the "Class") that Plaintiff seeks to represent is defined as follows:

> All persons within the United States who purchased or are the current owners of one or more SecureSpend Prepaid Debit Card(s) and had available less than the Card Value amount of funds when they went to use the Card.

145.   In addition, Plaintiff seeks to represent the following California Sub-Class (the "Sub-Class") of which Plaintiff is a member:

> All persons within the State of California who purchased or are the current owners of one or more SecureSpend Prepaid Debit Card(s) and had available less than the Card Value amount of funds when they went to use the Card.

146.   The Class and Sub-Class are collectively referred to as the "Classes."

147.   Excluded from the Classes are Defendants' officers, directors, and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff.

148.   ***Numerosity***.   The members of the Class and Sub-Class are so numerous that their individual joinder is impracticable. InComm's website states that InComm has "Over 1000 Global Partners" and "over 525,000 points of retail distribution," and handles "over $50 billion in annual transaction volume." Based on the elevated volume of InComm cardholders, Plaintiff estimates that hundreds of thousands of InComm customers were harmed by Defendants' present conduct.

149.   ***Existence and Predominance of Common Questions of Law and Fact.*** Common questions of law and fact exist as to members of the Class and predominate over any questions affecting only individual Class Members. All members of the Class and Sub-Class have been subject to the same or substantially similar conduct and their claims are based on the widespread dissemination of the unlawful, deceptive, and unfair conduct by Defendants. The common legal and

- 29 -

factual questions include, but are not limited to, the following:

a.      Whether InComm marketed and sold Cards as purporting to contain the Card Value of the SecureSpend Cards while knowing that a substantial portion of their Cards in fact held less than the Face Value;

b.      Whether InComm withheld information from Purchasers and Recipients about whether its SecureSpend Cards commonly hold less than their Card Value;

c.      Whether InComm failed to take reasonable, industry-standard measures to safeguard its SecureSpend Cards against fraud and/or other security threats;

d.      Whether InComm withheld information from Purchasers and Recipients about its failure to take reasonable, industry-standard measures to safeguard its SecureSpend Cards against fraud and/or other security threats;

e.      Whether InComm failed to implement additional security measures for its Cards once it was aware of instances of fraud on SecureSpend Cards;

f.      Whether InComm failed to provide refunds or replacement funds for SecureSpend Cards that had funds wrongfully depleted;

g.      Whether InComm failed to provide refunds of fees associated with the purchase of SecureSpend Cards that had funds wrongfully depleted;

h.      Whether InComm employed a prohibitive and discouraging process of handling reports of wrongfully depleted funds in an effort to avoid paying refunds or providing replacement funds;

i.      Whether InComm withheld information from Purchasers and Recipients about its prohibitive and discouraging process of handling reports of wrongfully depleted funds;

AMENDED CLASS ACTION COMPLAINT

j.       Whether Defendants' conduct with regards to advertising, selling or issuing the Pre-Paid Visa Credit Cards violated California law and/or public policy

k.       Whether InComm is liable for violating the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.;

l.       Whether InComm is liable for violating the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.;

m.       Whether InComm was unjustly enriched by the acts and omissions alleged herein;

n.       Whether, because of Defendants' misconduct, Plaintiff and the Classes are entitled to equitable and declaratory relief, and, if so, the nature of such relief;

o.       Whether Plaintiffs and the Classes are entitled to punitive damages; and

p.       Whether other, additional relief is appropriate and the nature of such relief.

150.   **Typicality**. Plaintiff's claims are typical of the claims of the members of the Classes in that they were not able to receive the full benefits of the Gift Cards due to the wrongful practices of Defendants. Plaintiff's claims arise from the same practices and/or substantially similar course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

151.   **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has retained counsel experienced in consumer protection law, including complex class action litigation. Plaintiff has no adverse or antagonistic interests to those of the Classes and will fairly and adequately protect the interests of the Classes. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and the proposed Classes.

152.   **Superiority**. A class action is superior to all other available means for the fair and

efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the courts and the issues raised by this action.

153.    The damages or other financial detriment suffered by individual members of the Classes may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. The injury suffered by each individual member of the proposed Classes is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.

154.    It would be virtually impossible for members of the proposed Classes to individually redress effectively the wrongs to them without Court intervention. Even if the members of the proposed Classes could afford such litigation, the Court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.

155.    By contrast the class action device used in conjunction with the Public Injunctive Relief sought as a Private Attorney General Action pursuant to Cal. Business and Professions Code § 17204 presents far fewer management difficulties, and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Fed. R. Civ. P. 23(b)(3).

156.    Unless the Classes are certified, Defendants will continue their unlawful, unfair, and predatory practices as described herein. If the Classes are certified, the harms to the public and the Classes can be easily rectified.

157.    ***Appropriateness of Final Injunctive Relief Under Fed. R. Civ. P. 23(b)(2)***. The

prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for InComm. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and would impair those interests. InComm has acted and/or refused to act on grounds generally applicable to the Classes, making final injunctive relief or corresponding declaratory relief appropriate.

158.    Defendants have acted or refused to act on grounds that are generally applicable to the Classes so that declaratory and injunctive relief is appropriate to the Classes as a whole, making class certification appropriate pursuant to Fed R. Civ. P. 23(b)(2).

159.    Injunctive relief is particularly necessary in this case because: (1) Plaintiff and the Classes want to use the Card Value of their Cards; (2) Plaintiff and putative Class Members may purchase or receive Cards in the future; (3) InComm has not cured the security defect that is leading to Cards holding less than their Card Value; and (4) Plaintiffs and the Classes do not have the ability to determine whether InComm intends to (a) remedy the security defect(s), or (b) continue to conceal material information about whether the Cards hold their full Card Value. Indeed, Plaintiffs and putative Class Members expect that without injunctive relief, InComm will continue to sell Cards that will have less than Card Value when Recipients use, or try to use, them and will continue to conceal that fact.

### III.    <u>FIRST CAUSE OF ACTION</u>

**Violations of the California Consumer Legal Remedies Act**

**(Cal. Civ. Code § 1750, *et seq.*)**

**(On Behalf of Plaintiff and the California Sub-Class against both Defendants)**

151.    Plaintiff realleges and incorporates by reference all the above paragraphs of this

Complaint as though fully stated herein.

152.    Plaintiff brings this claim individually and on behalf of members of the proposed California Sub-Class.

153.    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq. ("CLRA"), is a comprehensive statutory scheme liberally construed and applied to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property, or services to consumers primarily for personal, family, or household use.

154.    The CLRA prohibits unfair or deceptive practices in connection with the sale of goods or services to a consumer.

155.    The CLRA is meant to be "liberally construed and applies to promote its underlying purposes, which are to protect customers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." Cal. Civ. Code § 1760.

156.    The CLRA defines "goods" as "tangible chattels bought or leased for use primarily for personal, family, or household purposes." Cal. Civ. Code § 1761(a).

157.    SecureSpend Cards constitute "goods" as defined in California Civil Code §§ 1761(a)–(b).

158.    The CLRA defines "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Cal. Civ. Code § 1761(b).

159.    The Gift Cards constitute either "goods" or services, or both, bought for use primarily for personal, family, or household purposes.

160.    Defendants InComm and Pathward are each a "person" as defined in Cal. Civ. Code § 1761(c).

161.    Plaintiff and Class members are "consumers" who purchased or are the current owners of the Gift Cards, and were denied access to or full use of Gift Cards, which constitute goods or services for personal, family, or household purposes as defined by the CLRA. Cal. Civ. Code § 1761(d).

162.    Each of the debit card purchases are "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e).

163.    As alleged herein, InComm made numerous omissions concerning the security of its Cards and concerning the Card Value of its Cards, its security practices, and its reimbursement practices, while collecting fees from Purchasers to issue, facilitate, and process the Cards, including the use of funds on the Cards.

164.    Defendants' actions, representations, and conduct have violated, and continue to violate the CLRA, because they extend to transactions that intended to result, or which have resulted in, the sale of goods or services to consumers.

165.    Cal. Civ. Code § 1770(a)(5) prohibits representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, and advertising goods or services with intent not to sell them as advertised.

166.    Cal. Civ. Code § 1770(a)(9) prohibits advertising goods or services with the intent not to sell them as advertised.

167.    Cal. Civ. Code § 1770(a)(14) prohibits representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve.

168.    By, at minimum, misrepresenting that Gift Cards would function correctly, Defendants

violated the CLRA.

169.     InComm engaged in unfair or deceptive acts or practices in violation of Civil Code § 1770. Specifically, InComm's acts, practices, and omissions were intended to, and did result in, the sale of goods in violation of Civil Code § 1770.

170.     As alleged herein, InComm distributed, marketed, and advertised its goods as "gift cards" holding the worth of their Card Value while deliberately concealing material facts about, and central to the function of, those goods and services. InComm's omissions were material because they were likely to deceive reasonable consumers into believing they were purchasing Cards that would have purchasing power equal to the Card Value when first used by the intended Recipient. Plaintiffs and putative Purchaser Class Members had no way of unraveling InComm's deception on their own, and they could not have known the truth about whether InComm's SecureSpend Cards were likely to retain their Card Value after purchase. Had InComm disclosed that its Cards were particularly vulnerable to fraud because of InComm's inadequate security measures such that they were likely to hold less than their Card Value, and that InComm would not reimburse for theft loss of Card Value, Plaintiffs and Purchaser Class Members would not have purchased them.

171.     For instance, Defendants represented that the value of the initial SecureSpend Card purchased by KEVIN SMITH was $200.00. However, in actuality, that SecureSpend Card was worthless as Plaintiff was unable to access or make purchases with the card. Therefore, Defendants represented that the Gift Card was worth $200 more than what it was actually worth upon activation.

172.     InComm owed Plaintiffs and Purchaser Class Members a duty to disclose the truth about the value of the Cards because InComm: (1) possessed exclusive knowledge of those matters, (2) was engaging in purchase transactions with Plaintiffs and Purchaser Class Members as "consumers" of the Cards, and (3) intentionally concealed the foregoing from Plaintiffs and Purchaser

Class Members.

173.    Plaintiff suffered actual monetary damages as a direct and proximate result of Defendants' violations of the CLRA, as he expected the Gift Card to be worth $200.00, but instead, he received a Gift Card worth nothing, as it could not be used and InComm has failed to send a replacement card. Plaintiff also suffered the loss of the $5.95 card fee, as he paid for the use of the card which actually had no value.

174.    As a direct and proximate cause of InComm's violations of the CLRA, Plaintiffs and the Purchaser Class have suffered injury-in-fact and actual damages resulting from InComm's material omissions. Plaintiffs and Purchaser Class Members would not have purchased SecureSpend Cards had InComm disclosed that the funds were likely to be depleted by fraudulent use and theft. InComm knew the Cards were insecure because of InComm's inadequate security measures, and InComm did not inform consumers that Card funds would be improperly depleted, leaving consumers to fend for themselves in discovering the problem and attempting to remedy these issues.

175.    The facts InComm omitted and concealed from Plaintiffs and Purchaser Class Members are material because a reasonable consumer would have considered them important in deciding whether to purchase a SecureSpend Card and/or deciding how much to purchase in Card Value amount(s).

176.    Upon information and belief, Defendants' violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful under California law and was motivated in substantial part by Defendants' self-interest, monetary gain, and increased profits.

177.    Plaintiff further alleges that Defendants knew, or reasonably should have known, that harm was likely to result to Plaintiff. Defendants engaged in such unfair and deceptive conduct notwithstanding such knowledge.

AMENDED CLASS ACTION COMPLAINT

178.    Plaintiff suffered an "injury in fact," because Plaintiff's money was lost, as a direct and proximate result of Defendants' conduct alleged herein.

179.    As a direct and proximate result of Defendants' violations of the CLRA's statutory sections alleged herein, Plaintiff is entitled to a declaratory judgment that Defendants violated the CLRA.

180.    Filed concurrently with the original Complaint as Exhibit A is a signed affidavit from Plaintiff, pursuant to Cal. Civ. Code § 1780(d).

181.    On or about September 15, 2022, Plaintiff, through counsel, served on Defendants or their agents a notice of alleged CLRA violations via certified mail, which asked Defendants to correct, repair, replace, or otherwise rectify the goods and services alleged to be in violation. This correspondence advised Defendants that such action must be taken within thirty (30) calendar days.

182.    This cause of action is for injunctive relief only at this time, and Plaintiff reserves the right to amend the Complaint to assert actual, punitive, and statutory damages against Defendants pursuant to Cal. Civ. Code § 1782.

183.    Plaintiff reserves the right to allege further conduct that constitutes other unfair business acts or practices. Such conduct is ongoing and continues to this date.

184.    Plaintiff seeks public injunctive relief pursuant to Cal. Civ. Code § 1780, *et. seq.* ("CLRA") to benefit the general public directly by bringing an end to Defendants' unlawful business practices which threaten future injury to the general public.

### IV.    <u>SECOND CAUSE OF ACTION</u>

**Violations of the California Unfair Competition Law**

**(Cal. Bus. & Prof. C. § 17200, *et. seq.*)**

**(On Behalf of Plaintiff and the California Sub-Class against both Defendants)**

185.    Plaintiff realleges and incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

186.    The UCL defines "unfair business competition" to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

187.    Plaintiffs, Class Members, and InComm are each a "person" under Cal. Bus. & Prof. Code § 17201.

188.    The UCL imposes strict liability. Plaintiff need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

A.      "Unfair" Prong

189.    A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practices against the gravity of the harm to the alleged victims.

190.    Incomm has engaged in and continues to engage in unlawful, unfair, and fraudulent business acts and practices in violation of section 17200. Such acts and practices include, but are not limited to, the following:

a.    Incomm has violated, and continues to violate, California Civil Code section 1714 and common law negligence. Incomm owes a duty to provide security adequate to prevent foreseeable harm to Non-Reloadable Card cardholders. Card draining is a foreseeable result of inadequate security. Incomm is aware of card draining affecting SecureSpend debit cards and the reasons the cards are susceptible to card draining. Incomm has breached its duty to provide security adequate to

prevent foreseeable harm to SecureSpend cardholders by failing to provide such security. SecureSpend cardholders and purchasers are injured as a result of Incomm's breach.

b. Incomm has violated, and continues to violate, California Civil Code section 1748.31 by:

i. Imposing liability on SecureSpend cardholders for unauthorized transactions without giving adequate notice to SecureSpend cardholders of the potential liability;

ii. Imposing liability on SecureSpend cardholders for unauthorized transactions without providing a means to identify the debit cardholder to whom the debit card is issued;

iii. Imposing liability of greater than $50 on SecureSpend cardholders without transmitting the statement identified in Civil Code section 1748.31(b);

iv. Imposing liability of greater than $50 on SecureSpend cardholders where cardholders have timely reported unauthorized charges; and

v. Imposing liability of greater than $50 without establishing that an unauthorized use would not have occurred had the cardholder timely notified Incomm.

c. Incomm has violated, and continues to violate, the Consumer Legal Remedies Act, codified at Civil Code section 1750, et seq. by engaging in the following practices prohibited by the Civil Code section 1770(a) in transactions which were intended to result in, and did result in, the sale of SecureSpend debit cards:

i. Representing that SecureSpend cards have characteristics uses, or benefits that they do not have, in violation of Civil Code section 1770(a)(5);

ii. Representing that SecureSpend cards are of a particular standard, quality, or grade when they are of another, in violation of Civil Code section 1770(a)(7); and

iii. Representing that a transaction confers or involves rights, remedies, or

obligations that it does not have or involve, in violation of Civil Code section 1770(a)(14).

      d.   Incomm has engaged in, and continues to engage in, fraudulent business practices and in unfair, deceptive, untrue, or misleading advertising, by making deceptive, untrue, and misleading statements and omitting material information in connection with the sale of their products and services, including SecureSpend cards. Incomm's deceptive, untrue, and misleading statements include, but are not limited to, the following:

          i.   InComm omits that Cards commonly have less purchasing power than their Card Value at the time of purchase due to theft;

          ii.   InComm omits that Unauthorized Users exploit a specific flaw in InComm's online security measures, detailed below, that allow them to access and spend the Card Value of Plaintiffs' and Class Members' SecureSpend Cards before Plaintiffs and Class Members can do so; and

          iii.   InComm omits that it avoids reimbursing Purchasers and Recipients for fraud losses when they occur prior to the consumer's first attempted use of the Card.

      e.   Incomm's practices, representations, and statements are likely to mislead a reasonable consumer.

      f.   Incomm's acts and practices are unfair business practices because they offend established public policy, the harm they cause to consumers greatly outweighs any benefits associated with those practices, and they are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.

191.   Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in a misleading, deceptive and unfair practices of intentionally misrepresenting and/or omitting the fact from consumers that they would either have delayed, limited or no access at

all to the funds in their Gift Cards.

192.    Further, consumers, such as KEVIN SMITH and members of the Sub-Class, paid Defendants an activation fee of $5.95 to have access to the funds listed as the face-value of their SecureSpend Cards. Upon activation, consumers realized that they had less funds on their SecureSpend Cards than was advertised. The fact that Defendants charged an activation fee for Plaintiff and Sub-Class Members to utilize all of the funds loaded onto the SecureSpend Cards yet deprived Plaintiff and Sub-Class Members of all of the funds loaded onto their SecureSpend Cards is unfair in and of itself.

193.    Notably, InComm advertises their SecureSpend Cards as providing consumers with access to all of the funds they have loaded onto those cards, exclusive of the $5.95 activation fee. However, when it comes time for consumers to activate their Gift Cards, they are often left with less than what was initially loaded onto those cards at purchase, or alternatively, the Gift Cards do not work at all.

194.    Through their practices, Defendants make or save millions of dollars which should have, in all fairness, been permanently credited to Plaintiff and the California Sub-Class.

195.    Defendants' acts and practices offend an established public policy of transparency when it comes to advertising goods and services, and are immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

196.    The harm to Plaintiff and Class Members grossly outweighs the utility of Defendant's practices as there is no utility to Defendants' practices.

**B.    "Fraudulent" Prong**

197.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming general public.

198.     Defendant's acts and practices alleged above constitute fraudulent business acts or practices as they deceived KEVIN SMITH and Sub-Class Members and are highly likely to deceive members of the consuming public.

199.     As described with particularity above, Defendant InComm represents to consumers, as an agent of Pathward, that the amount loaded onto the SecureSpend Cards, not including the activation fee, is the amount that consumers would be able to withdraw from the SecureSpend Cards.

200.     However, as demonstrated above, Sub-Class Members only had a fraction of the amount of funds loaded onto the SecureSpend Cards available to them and were unable to determine why that was the case since Defendants made it difficult for them to access the accounts associated with their respective Gift Cards.

**C.     "Unlawful" Prong**

201.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

202.     Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of the CLRA, as described in Plaintiff's First Cause of Action.

203.     The violation of any law constitutes an "unlawful" business practice under the UCL.

204.     These acts and practices alleged were intended to or did result in violations of the CLRA.

205.     Defendants' practices, as set forth above, have misled Plaintiff, the Sub-Class Members, and the public in the past and will continue to mislead them in the future. Consequently, the practices of Defendants constitute unfair and unlawful business practices within the meaning of the UCL.

206.    Pursuant to the UCL, Plaintiff and the Sub-Class are entitled to preliminary and permanent injunctive relief and order Defendants to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Sub-Class of all the revenues associated with this unfair and unlawful competition, or such portion of said revenues as the Court may find applicable.

## V.    THIRD CAUSE OF ACTION

### Unjust Enrichment

### (On Behalf of Plaintiff, the Class and the California Sub-Class against both Defendants)

207.    Plaintiff realleges and incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

208.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Sub-Class against Defendants.

209.    "Under California law, the elements of unjust enrichment are: (a) receipt of a benefit; and (b) unjust retention of the benefit at the expense of another." *Valencia v. Volkswagen Grp. of Am. Inc.*, 119 F. Supp. 3d 1130, 1142 (N.D. Cal. 2015); *see also Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (2011) ("Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract.'")

210.    "When a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). "Whether termed unjust enrichment, quasi-contract, or quantum meruit, the equitable remedy of restitution when unjust enrichment has occurred 'is an obligation (not a true contract [citation]) created by the law without regard to the intention of the parties, and is designed to restore

the aggrieved party to her or her former position by return of the thing or its equivalent in money.'" *F.D.I.C. v. Dintino*, 167 Cal. App. 4th 333, 346 (2008).

211.    Plaintiff, the Class and Sub-Class members conferred non-gratuitous benefits upon Defendants through activation fees and loading funds onto Gift Cards, that they were subsequently prevented from using as reasonably expected, whether or not they paid the money themselves or later become the owners of the Gift Cards.

212.    Defendants significantly and materially increased Defendants' revenues, profit margins, and profits by unjustly enriching Defendants at the expense and to the detriment of Plaintiff, the Class and Sub-Class members.

213.    Defendants owe money to Plaintiff, the Class and Sub-Class for the improper conduct described herein. Specifically, Plaintiff, the Class and Sub-Class members either paid for one or more SecureSpend Cards to use anywhere MasterCard or Visa was accepted, or were provided with such cards for their own use.

214.    However, by charging an activation fee and subsequently providing Plaintiff, Class and Sub-Class members with nothing when the Card does not function, or with less than what was loaded onto the SecureSpend Cards (i.e., less than what was represented would be available on the SecureSpend Cards for Plaintiff, Class and Sub-Class members to use), Defendants retained monies they were not otherwise entitled to, resulting in a benefit to Defendants by way of increased profits and detriment to Plaintiff, the Class and the Sub-Class members. At the very least, the delay in providing Plaintiff, the Class and Sub-Class full access to all the funds loaded on the Gift Cards unjustly enriched Defendants at the expense of Plaintiff, the Class and Sub-Class.

215.    Defendants are therefore indebted to Plaintiff, the Class and the Sub-Class in a sum certain, specifically the deed actually paid by the purchasers of the Gift Cards.

216.     Further, Defendants are indebted to Plaintiff, the Class and Sub-Class in a sum certain for the additional money had and received by the Defendants, which the Defendants in equity and good conscience should not retain.

217.     Defendants are liable to Plaintiff, the Class and Sub-Class in the amount of unjust enrichment or money had and received to be determined at trial.

218.     Defendants' retention of any benefit collected directly and indirectly from the payments for use of the Gift Cards offered by Defendants violates principles of justice, equity, and good conscience.

219.     Plaintiff, the Class and Sub-Class members are entitled to recover from Defendants all amounts that Defendants have wrongfully and improperly obtained, and Defendants should be required to disgorge to Plaintiff, the Class and the Sub-Class members the benefits that Defendants have unjustly retained.

220.     Defendants have retained such monetary benefits for their own financial gain. Thus, Defendants have been unjustly enriched in retaining the revenues and profits from the payments of Plaintiff, the Class and Sub-Class, which retention under these circumstances is unjust and inequitable.

221.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff, the Class and Sub-Class members have suffered concrete harm and injury, including, but not limited to, monetary loss in connection with their purchases of the goods or services pertaining to the Gift Cards as well as the loss of funds that were loaded onto the Gift Cards prior to activation.

222.     Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff, the Class and Sub-Class would be unjust and inequitable.

223.     Plaintiff, the Class and Sub-Class members are entitled to seek disgorgement and

restitution of wrongful profits, revenue, and benefits conferred upon Defendants in a manner established by this Court.

224.     Plaintiff, the Class and Sub-Class members request the Court enter an order awarding them restitution, rescission, and/or damages, and that they are entitled to recover their reasonable attorneys' fees.

225.     Plaintiff, the Class and Sub-Class members therefore also seek pre-and-post- judgment interest and attorneys' fees and costs as allowed by statute, including without limitation those recoverable under Cal. Code Civ. Proc. § 1021.5, any common law "private attorney general" equitable doctrine, any "common fund" doctrine, any "substantial benefit" doctrine, and/or any equitable principles of contribution and/or other methods of awarding attorneys' fees and costs.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, all other Class Members similarly situated, and the general public pray for judgment against Defendants, and each of them, as to each and every cause of action, and the following remedies:

A.  An Order declaring this action to be a proper class action, appointing Plaintiff as class representative, and appointing Plaintiff's attorneys as class counsel;

B.  An Order requiring Defendants to bear the cost of class notice(s);

C.  An Order awarding declaratory and other equitable relief, including recission, as necessary to protect the interest of Plaintiff and members of the Classes;

D.  An Order enjoining Defendants from engaging in the unfair, unlawful, and deceptive business practices complained herein, including through public injunctive relief;

E.  An Order requiring Defendants to pay all actual and statutory damages permitted under the causes of action alleged herein;

F. An Order requiring Defendants to pay punitive and/or exemplary damages permitted under the causes of action alleged herein;

G. An award of pre-and-post-judgment interest;

H. An award of attorneys' fees and costs as allowed by statute, including without limitation those recoverable under Cal. Code Civ. Proc. § 1021.5, any common law "private attorney general" equitable doctrine, any "common fund" doctrine, any "substantial benefit" doctrine, and/or any equitable principles of contribution and/or other methods of awarding attorneys' fees and costs;

I. An order requiring imposition of a constructive trust and/or disgorgement of Defendants' ill-gotten gains and to pay restitution to Plaintiff and all Class Members and, also, to restore to Plaintiff and members of the Classes all funds retained by means of any act or practice declared by this court to be an unlawful, fraudulent, or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;

J. Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery where necessary and as applicable, to prevent Defendants from retaining the benefits of their wrongful conduct;

K. Costs of this suit; and

L. Any other and further relief, including rescission, that the Court deems necessary, just, or proper.

## VII.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues triable by jury.

Dated:  March 21, 2024                    Respectfully submitted,


By:  */s/ John D. Blythin*                            

**ADEMI LLP**
John D. Blythin (admitted pro hac vice)
3620 East Layton Avenue
Cudahy, WI 53110
Tel. 414.482.8000
jblythin@ademilaw.com


**BOWER LAW GROUP, PC**
David E. Bower (SBN 119546)
600 Corporate Pointe, Suite 1170
Culver City, California 90230
Tel. 213.446.6652
dbower@bowerlawgroup.com


*Attorneys for Plaintiff*

AMENDED CLASS ACTION COMPLAINT